Robert J. Thompson v. Gold Medal Bakery, Inc. Appeal No. 201027. Thank you, Your Honor. And I wanted to begin by addressing the Social Security Cleveland issue in this matter that Mr. Thompson shortly after his discharge applied for and received Social Security. In particular, I want to give the explanation required under Cleveland that shows that a reasonable juror could be convinced both the truth of and the good faith belief Mr. Thompson had when he applied for Social Security and at the same time filed the state and federal disability claims before the court. And I'd like to do that, if the court would allow me, by distinguishing the Painter decision, which was a substantial portion of the lower court's decision. In fact, essentially on this issue, Painter came down and it was decided by this circuit between the date of our argument and the date of the decision. And I think the distinguishing markers are also Mr. Thompson's explanation. And those are that, first of all, Mr. Thompson, throughout this litigation and since the date he was ready to return to work, has said he could do his job. He had worked at the company for 37 years. It was essentially his only job since high school. The position he was in had all but been created for him based on his experience. And he understood the job. He knew his physical condition. He was out because he had total right knee replacement, but he also had a series and a history of other injuries. These included a left knee that perhaps needed a replacement, back injuries, gout, vertigo, and other physical injuries that affected him. Excuse me, counsel. None of that is an explanation of why he told the Social Security Administration and the company's LTD insurer that he was totally disabled and now claims that he isn't totally disabled. That's where you've got to address the reasoned explanation. The reason he did that, Your Honor, I think it's important because this is an FMLA lead. And that the only issue on his return was the ameliorative undertaking he went through. With all due respect, counsel, you're conflating two issues. You've got to account for ADA discrimination, Americans with Disability Act. That's where the reasoned explanation requirement arises because Cleveland, as explicated in that decision in Pena, says that that is going to stop his ADA claim unless it's explained away. Unless there's a reasoned explanation. His FMLA claim, which is a retaliation claim, is separate. Cleveland and Pena don't bar that claim at all. No one contends that they do. But you've got two separate issues and you can't conflate them. No, I understand that, Your Honor. But his explanation, and again, I'm looking at it as if he was explaining it to a jury, would be that I applied for both because I was ready to come back to work for the injury I had. If my employer had allowed me the five days I needed, three business days, to get the note from my doctor, which he ultimately did get and which cleared him to work, I would have been back to work. But when I lost that job, I decided to apply for Social Security. And the reason I applied for that is I had all these other injuries which I went to work with for years. He'd been treating with a doctor stove for pain for seven or eight years. He had dragged himself around on these knees. And the reason he went out and applied for Social Security was only because he was fired. But none of that explains why he told the Social Security Administration that several months before he was fired, he had become totally disabled. That's what you've got to explain away. Excuse me. It's not that he told the Social Security Administration, I've become disabled after I was fired. That's not what he said. And that's not what the SSA found. And that's where I think this case, Your Honor, falls right into what Justice Breyer was talking about with Cleveland. He filed because any Social Security attorney, and I did not represent them on that, would go back to the last day of employment, which was that May 8th date. And this is, when I say it applies to Cleveland, is Justice Breyer talked about disabilities changing over time, that the effect of them changing. And in that case, on May 8th, his application had to do with his knee. And there's no question. His doctor kept him out for three months until August. That's not the basis on which Social Security found him disabled. They found him disabled. And that's our point, Your Honor, that in that period, he was disabled for that, and that as he recovered from that, other disabilities, which were not a part of this, that the employer would not have known about if he had been allowed to come back on FMLA. And that's where the two statutes interplay. Let me ask it this way. In order to get the SSDI benefits, he had to be permanently disabled, correct? Within a range, yes. I mean, they don't consider accommodation, and you can't work while you're on SSDI. So what was his representation to get the SSDI benefit about when he became permanently disabled? His representation was on the application, May 8th was the last day he worked. So the difficulty then is that's too early for purposes of you getting around Cleveland. Unless you can somehow explain how he could be permanently disabled on May 8th, and yet under Cleveland, he could somehow have been ready to go back to work on May 8th. Well, again, because on this case, Your Honor, he would have been ready. He had his knee repaired. That's true if he had never made the representation to the contrary. But he did make the representation to the contrary. That's what we're trying to figure out, how you can get around that. Well, the way around it, Your Honor, is he's traditionally stopped, according to the Cleveland case. And that's an equitable remedy. And yet the defendant is relying on an equitable remedy to prevail where it acted inequitably. It did not give him those extra days to get a note that, as approved, said he could go back to work. Had that taken place, that's all the employer would have known. That's all that would have happened. Instead, he applied for unemployment, and he didn't get on unemployment because of his knee. His doctor, he wouldn't have got on long term. He got denied for other reasons because his doctor, Langworthy, said he could go back to work on that day just for his knee. What he did is, when he applied, these other long-standing injuries that predated this, and of which there's no evidence that between May and September or August, it became any worse. Those injuries, my expectation is he could have put an earlier date, that he could have gone out before this happened. But that's the explanation, is that he was not permanently disabled other than he decided to go on Social Security at the age of 55, which I would suggest is a big factor, and that Cleveland doesn't just hold that— Five minutes remaining. Afterwards, you can explain it otherwise. And that's how we're explaining it, is that he— Just so I understand it, you seem to be offering an explanation of why he decided to claim that he was permanently disabled on May 8th, when he hadn't previously made such a claim. But I have thought what you need to explain is why it would be consistent with the ADA claim to permit that to go forward. And that seems hard to do if you're conceding that he represented he was permanently disabled at that time. So I understand what explanation you're giving. You're making a very practical one about why he suddenly chose to say he was permanently disabled on May 8th, when prior to that he wouldn't have. And I'm sure had he not been fired, he wouldn't have made the request. But having made it, that does seem to stop an argument that you could now find him to be able to go back to work, if there is a representation that he's entitled to benefits because he can't. But again, my argument would be that the employer thereby benefits from what we allege is its own wrongdoing by not allowing him the additional time, which he very well should have. They end up with this whole— But that's your, you can bring an FMLA claim and you're not a stop to bring that if you have merit to that claim. And that's the other part of our argument, Your Honor. But I do believe these explanations and the distinctions between this and Pena explain why they are not inconsistent because his position is on August 9th, 11th, 12th, 17th, whatever date he was allowed to get the doctor's note and could have gotten it, it would have showed the employer that he was ready to return to work. It was only afterwards. And also, as we pointed out, Your Honor, we do feel— Last question on this, just about the record. You're not arguing to us that anything— —firing and the application— Judge Barron? I'm sorry, I think you were breaking up a little bit. You may want to repeat your question for the attorney. I apologize.  And the date of his representation for SSDI benefits that he couldn't go back to work. Did anything happen to him physically that changed his physical condition between those two dates that suddenly made him unable to go back to work, even though he could go back to work before? I was saying two things affected him, Your Honor. One was that he didn't have therapy for approximately three weeks before the application was submitted, that it was cut off because of his discharge, and he didn't have insurance. So physically, we contend, and we submitted a record when he resumed therapy in December that showed he had regressed some. And secondly, we are contending, apart from physical, and we think a big part of the Social Security decision was psychological, that the only consultative examination audit was a psychological one, and that— Where is it in the—Counsel, where is it in the record, in the SSDI record, that the disability award was somehow based on psychological disability? Your Honor, on RA-130, it states at that point—this is in the disability determination note— that the evidence made so far, medical and non-medical, was not sufficient to support the claim, and it was ordered that a CE be undertaken, and that was through a psychiatrist, who in part found that his functional ability and the effect of the discharge seemed to put him over that. That's—and again, it's disputed, but— About one minute remaining. And that's our position, that that worsened significantly when he was fired. This was the only job Mr. Thompson had in his adult life. It was his whole life. He testified repeatedly as to how significant it was to him and the effect it had on him. So we do contend that those two—they were those two differences between the date of the discharge and the firing and completion of the records with SSA. You can continue if you have— Oh, thank you. And just briefly, on the Industrial Accident Board and the long-term disability, I would say neither of those are affected by Cleveland for several reasons. One, neither are under oath, and Cleveland refers to a sworn statement. The Industrial Accident Board claim clearly has an alternative pleading. That's time. Okay. You can finish that thought. Well, it has alternative pleading. It both asks for temporary under Section 30, in total 34, and partial under 35, and that's allowed. It's certainly referenced in Cleveland. And then also, and I think more importantly, Mr. Thompson applied and immediately withdrew once he got his full medical. I was his counsel on that and did an abduct, aligning with his note, once we got that. And this is the difficulty with these cases. You're getting people—in this case, he goes from making 73 to nothing, and you've got an obligation to represent them, and they've got to make these allegations. And I don't see where, in the circumstances of this case, where his Social Security was not based on the injury he was out for. Instead, it was based on the misfortune that he was discharged, and as a result, the company got to learn more about him through the Social Security, and he's barred. I think that is an explanation for why, in his mind—and again, it's his good faith belief. Mr. Mitchell, thank you. Thank you. Did you reserve time? Two minutes. Okay, thank you. Attorney Kazmarek, if you could unmute your audio and video. I just want to check with my panel members. Is everybody's video and audio feed working okay? Yes, mine is. Okay, good. Okay. Attorney Kazmarek, you can begin. Thank you, Your Honors. Good morning, and may it please the Court. My name is Chris Kazmarek, and I represent the Appellee Gold Medal Bakery. As you know, there's two decisions on appeal here, and given Your Honor's questions, I'd like to start with the disability discrimination claim. So as was discussed just a few moments ago, on the one hand, Mr. Thompson told the Social Security Administration that— I'm sorry, Judge. Excuse me. I'm sorry, Mr. Kazmarek. Judge, is Judge Selya—he seems to be frozen. Is he still able to see and hear us? I am, yes. Okay, okay. Thank you. I apologize for interrupting. No problem at all. On the one hand, he told the Social Security Administration that he was completely disabled and unable to work. On the other hand, he's taken the exact opposite position in this litigation and has represented to the Court that he could go back to his position at Gold Medal Bakery. He has not presented, either in his papers or in an argument, any cogent explanation for how he can reconcile these two diametrically opposed positions. What about the timing point he just raised with us, that the firing put him over the edge psychologically and because of the lack of treatment during that period, so that even though he suffered many of these same ailments and was able to soldier on and go back to work as of May 8th, but after the firing, in light of the psychological effect of that and the lack of treatment, when he went to get the SDSDI benefits, he no longer was in a position to do that. Why wouldn't that be a way of reconciling it? So, a few points on that, Your Honor. First, he represented that he was completely disabled as of May 8th. He didn't say some point after the termination. Second, the psychological evaluation that he relies upon. In that report, the doctor states that he's, in fact, the psychological issues that he's experiencing flowed from his physical limitations, and that's in the record at 122 and 123. There's no connection in that report, which is the only psychological evidence in the record, that links his supposed psychological issues with his termination. Instead, they're linked by the doctor to his physical limitations. So, that just doesn't hold up. And as for the argument that we just heard, that he somehow wasn't able to get treatment during the intervening weeks between his termination and when he filed for SSDI, with all due respect, Your Honor, that's a new argument that we haven't heard either in the briefs or below. So, that should not be considered. The SSDI determined, as I understand it, Mr. Kaczmarek, that he was totally disabled as of a date that preceded his firing by some three and a half months? That is correct, Your Honor. The Social Security Administration found him to be disabled as of May 8, 2016. That was the day before he was going to go for knee replacement surgery, and he was not let go until August of 2016. So, there's many months in between. And let's be clear. When he made his application to the Social Security Administration, he did not make a one-off statement that I am disabled as of X date. He went into great detail on all of the various physical limitations caused by his hip and back problems and knee problems. He claimed to be in such extreme pain that he couldn't sleep at night. He said he was unstable and couldn't put his pants on. He said that he couldn't even sit through a movie because he was so distracted by the pain. He needed to use a cane on a daily basis. According to his own statements, he could not have performed the functions of lots of different positions, but certainly not his position at Gold Medal Bakery, which, based on his own testimony, the job description, and his representation to the Social Security Administration, was a very physically demanding job that required him to lift and squat and climb over equipment and kneel and climb stairs. This is a difficult job. And for him to represent, on the one hand, that he was completely disabled and then say, no, I actually could go back to work into this physically demanding job, there's no way that he can reconcile those two statements. And under Cleveland and under Pena, he should be precluded, as the district court properly held, from asserting his disability discrimination claim under both state or federal law. With regard to his FMLA claim, I'd like to just briefly run through a few quick facts on that, which my brother touched on briefly. First, Gold Medal had an attendance policy that Mr. Thompson was aware of that specifically states that all employees who are out for more than three days are required to provide a health care practitioner's note saying that they're cleared for full duty at the end of their leave. That requirement was in the leave of absence policy, it was in the FMLA policy. In May of 2016, when Mr. Thompson went out on his FMLA leave, Gold Medal sent him a reminder letter saying, listen, when you are ready to come back to work, you need to have a fitness for duty certificate from your health care provider in order to come back. It's undisputed that he was fired for failing to follow that policy, a policy that he was aware of, that he was reminded about, and which Gold Medal even gave him a few extra days to secure a doctor's appointment to get that piece of paper. He has not come forward with any evidence of pretext, nothing to suggest that he was retaliated against for taking FMLA leave. In fact, the person who is supposedly the bad actor here, who supposedly had retaliatory animus, was actually the person who suggested he take FMLA leave in the first place. And there's certainly been no evidence brought forward. Was it consistent with the FMLA to deny him those extra few days? Is it consistent with the FMLA to deny him the few extra days that he requested to get his fitness for duty certificate? Yes, it is, Your Honor, because he had already received the full allotment of 12 weeks of FMLA. But I think there's a reference in the FMLA to allowing extra time if nothing about the FMLA precludes other policies from kicking in, if those policies can be read to give you the extra time to get the doctor's note. Certainly, Your Honor, the company could have had a policy, adopted a policy to allow him a set period of time. There's nothing inconsistent in the FMLA with having such a policy. And although there was no such policy here, the company did give him a few extra days, but he was still unable to get the necessary doctor's note. And there's certainly no suggestion that the company, well, there's no evidence in the record that the company applied its policy inconsistently or in any way unfairly. Is there any dispute that he just needed a few days to get the note? I'm sorry? Is there any dispute over the question of whether he was going to be able to get the note if he had a few extra days? We don't know whether he was going to be able to get the note if he even had those extra couple of days. He actually didn't obtain the doctor's note until I believe it was October. And so it's unclear from the record whether he would have been able to provide that note even if he'd gotten the extra couple of days that he asked for. And what about the representations in the record that actually under the company policy, he was entitled to even more weeks because he had worked there for 25 years? So, Your Honor, those assertions reflect a prior policy of gold medal and not the policy that was in effect at the time of Mr. Thompson's FMLA leave. And in fact, if he was eligible for more time, it doesn't change the fact that under the FMLA, he still could have been terminated for failing to provide the fitness for duty certificate. And there's certainly no suggestion in the record that even if there was such a other policy out there, that it was applied to Mr. Thompson differently than it had been applied to other similar situated employees. So, what I'm trying to put together is if he was entitled as a 25-year-old long employee under company policy to stay longer than he did and the FMLA incorporates or defers to company policies that let you stay past that time. If both of those things are true, I took his argument to be that terminating him because he hadn't met the deadline under the FMLA doesn't make a whole lot of sense and therefore arguably supports the conclusion that the only reason they relied on the FMLA deadline to fire him is because they were mad he took the MFLE leave in the first place. What's your response to that? Well, again, we don't believe that Mr. Thompson is accurately describing the policy in effect at the time. And second… Is that a jury question, what policy was in effect at the time or not? I mean, isn't that just a factual dispute? If he's right about that, couldn't a jury find he's right about that, about what policy was in place? He has to provide an evidentiary basis for that assertion if we don't believe that he's done. If he's put forward competent summary judgment evidence and there's a dispute on that evidence, then that potentially could be a jury question. Assuming that he has done, and I realize you're arguing he hasn't, so if he hasn't, he hasn't. But assuming he has, what's your answer that might support the pretext argument, which is that there's no basis for concluding that he should have been fired for not having met the deadline of the FMLA if the FMLA itself recognizes that under the company policy, that wasn't a problem. And so it would be reasonable for a jury to then conclude that their explanation for why they fired him doesn't hold up. And therefore, they could conclude it was pretextual. So that might be possible, Your Honor, but not in this case because you have to read the two policies. You have to read the two policies in conjunction with one another. This supposed policy on the one hand that Mr. Thompson is talking about with the written policy on attendance that requires the fitness for duty form. And just because someone might be entitled to some additional time under one policy doesn't necessarily overwrite Trump the requirement that he provide a fitness for duty form. I don't believe there's any suggestion in the record that he ever requested this additional time off. And as we said before, we don't believe he's established an evidential basis for the existence of that policy. And to go to Your Honor's point, even if such a policy existed, he would have to show that it was applied, that others who were similarly situated to him were given the benefit of that policy, and he wasn't. And he certainly has not made that kind of profit in this case. So the district court assumed for the purposes of argument that Mr. Thompson had made out a prima facie case of retaliation, even though it doubted that Thompson proved causation. Do we need to consider the issue of causation and the theory of causation that's applicable? Your Honor, you don't need to wade into the issue of what standard of causation is appropriate under the FMLA in order to decide this case. We did argue below and continue to believe that Mr. Thompson did not establish causation. His only evidence of causation that he articulated was the timing of his termination relative to the end of his leave, in effect, saying it was so close in time to the end of his leave that you can infer causation. We argue below and we continue to believe that in the context of FMLA, that sort of temporal proximity is completely inappropriate, because if you were to adopt that argument, then every time someone was terminated shortly after the end of an FMLA leave, including for doing things like not producing a fitness for duty certificate, you would have to conclude that that was retaliatory causation, which is completely at odds with the requirements of the FLSA. Excuse me, FMLA. I have just a procedural question. So the. In terms of the jury finding here. Right. Did the jury make a finding regarding pretext? So, Your Honor, this was decided on a motion. On summary judgment, right? Just summary judgment. OK. You answer the question. Thanks. So ultimately, Your Honor's gold medalist position has laid out in the record that Mr. Thompson's pretext for retaliatory animus under the FMLA, the court should affirm the district court's entry of summary judgment in gold medalist favor on Mr. Thompson's retaliation claim. And unless Your Honor's have additional questions, I'll rest. No, thank you. Thank you. Thank you, counsel. At this time, I believe Attorney Mitchell has two minutes of rebuttal. Thank you, Your Honor. It's just on the FMLA quickly. Mr. Thompson did go on the 17th, kept his appointment. There's a note dated the 17th that clears him, that finds him able to do all. It was actually more than a return to work note. It was a long term disability note supplied by the lawyer on the date of his discharge, August 11th. So there is a note. It clears him to work. He could have gone to work. Secondly, as far as the short term disability report at RA 562, there's a payroll change form signed by Christina Marquesa, who my client testified and Ms. Marquesa testified that she told him about the 25 week employment when they met in April for his leave. So there's whether or not the policy existed in this, some dispute about whether it ended in May of 16 or April or after. There's no question that he was relying on it, that he had been told at the meeting that that was the policy, that that's the time he had. And she filed the payroll change form that day, April 26th, with the company, indicating that he would have the 25 weeks. Our position on the animus is it's not only temporal, but the fact that Mr. Ferreira, who fired on top of everything else, didn't understand this policy. One reason they shifted attendance attention to the attendance policy is simply because Mr. Ferreira testified the FMLA policy refers to absent unusual circumstances. Ms. That you have to come back in 12 weeks if there's other circumstances. Ms. Marquesa testified that meant if you had an ADA disability, which we contend is the case here. So Mr. Ferreira, who's the firing authority, he testifies. I never knew about the unusual circumstances, don't know what they might be. And he further testified. I know nothing at all about accommodations. I've heard of them, but I don't know about them. And then he further went on and said, well, I consider him for a brief, no more than a week. If someone said I need another week for therapy or something, I'd consider it. Otherwise they're gone. And that he wouldn't consider it for anyone. So we believe that together. That's time. Thank you. Mr. Mitchell, I have one just question. Just try to understand how this works. Is it reference to something you allude to? I think in your argument, I'm just trying to understand how after Cleveland, the person in Mr. Thompson's situation is supposed to conduct themselves. So you're fired. You now face the loss of the income, which I suppose is in many cases going to be much higher than the income you could get from SSDI benefits. You think you have an ADA claim, but you don't know whether you're going to win on your ADA claim. So you need relief right away. So you apply for your SSDI benefits. They're not as good as the money you could get if you were successful on the ADA claim, obviously. But you need something. So you apply for the SSDI benefits. What are you supposed to do to protect yourself to keep that ADA claim alive in the interim? Do you have to just set the onset date later? I mean, what would you what do people advise somebody in a situation like this to do? Speaking of the council and those who do more Social Security, that's what they are. Yes, they're advising. But in a way, it's unrepresentative. It affects benefits depending on when someone, you know, at least back benefits. And there's a reluctance with Social Security attorneys to do that because it does affect the presentation of the case. It affects how far it goes back. But I don't read Cleveland as an absolute bar to going back because you can't explain, as in this case, how there's different reasons for their finding total disability in Social Security, which is consistent, I believe, in this case with making the claim that he was out on a very limited procedure, which bedded him. And here the employer, the explanation is, if they had allowed me back, I would have been back and I wouldn't have applied for Social Security. I only had to do it because they put me in this position. Thank you. Thank you. Thank you, counsel. That ends the argument in this case. Attorney Mitchell and Attorney Kaczmarek, you should disconnect from the meeting at this time.